Exum et al. *v.* Canty et al.

---

BENJAMIN EXUM et al. *v.* ZACHARIAH CANTY et al.

1. CONSIDERATION: COVENANT TO STAND SEISED BETWEEN STRANGERS: WHAT A SUFFICIENT CONSIDERATION FOR: CONDITION SUBSEQUENT.—Services which have theretofore been gratuitously rendered by the covenantee to the covenantor, and which are to be continued to him during his life, are a sufficient consideration to support a covenant to stand seised between strangers; and it makes no difference that there is no binding obligation on the covenantee to render such future services, if he actually perform them, for in such a case the rendition of the future services is a condition subsequent, which, when performed, gives full effect to the covenant.

2. DEED: WILL: DISTINCTION BETWEEN: CASE IN JUDGMENT.—An instrument which, in consideration of love and affection, and of past services rendered, and of future support for his life to be given by the beneficiary therein to the

Exum et al. *v.* Canty et al.

maker, stipulates that the latter will stand seised of the real and personal property therein mentioned, for his own use during his life, and no longer, and that then a trustee shall convey it to the use of the beneficiaries, vests in them an interest *in presenti*, to take effect in possession *in futuro*, after the death of the maker, and is therefore a deed, and not a will. See *Wall* v. *Wall*, 30 Miss. R. 99.

3. HIGH COURT: WILL NOT NOTICE POINTS NOT MADE IN THE COURT BELOW.— Where an instrument, purporting on its face to be a covenant to stand seised, is attacked by the bill, upon the ground of the incapacity of the covenantor to execute it, it will be too late in this court, when the cause is here upon appeal from decree of the chancellor dismissing the bill on final hearing, for the complainants to insist upon its invalidity, upon the ground that it is a will, and has not been duly probated and recorded.

4. EVIDENCE: MENTAL CAPACITY GOVERNED BY EVIDENCE RELATING TO THE TIME WHEN IT IS ASSAILED.—Where there is a conflict in the evidence in relation to the sanity of a grantor, the testimony of those witnesses, *cœteris paribus*, which relates to the point of time nearest the date of its execution, is entitled to the most weight.

5. SAME: DISPOSITION OF PROPERTY ACCORDING TO PREVIOUS INTENTION EVIDENCE OF SANITY.—In a controversy concerning the sanity of a grantor, the fact that the deed disposes of his property in accordance with his previous intentions, as frequently declared when he was unquestionably sane, is a circumstance tending to show the capacity of the grantor to make the deed.

APPEAL from the District Chancery Court at Carrollton. Hon. James F. Trotter, vice-chancellor.

On the 12th of April, 1853, Benjamin Exum and others, who were the children of the deceased brothers and sisters of John Williams, deceased, and his heirs-at-law, filed their bill in the court below against Zachariah Canty, trustee, &c., James W. Canty, and Camilla F. Canty, his wife, and James G. Kelly.

The bill, after setting out the relationship of the complainants to John Williams, in substance charged, that in the year 185 , the said John Williams died, leaving a large real and personal estate, the land situated in South Carolina, and the slaves, of which there were , being in this State, in the hands of Kelly, as administrator of Williams, and that they have never been in possession of Z. Canty. That on the 18th of July, 1850, the said John Williams made a deed of gift or covenant to stand seised, which is in the following words and figures :—

" South Carolina. Know all men by these presents, that I, John Williams, of Kershaw District, of the State aforesaid, for and in consideration of my regard and good-will for James W. Canty, and Camilla F. Canty, his wife, and in consideration that they have heretofore, and henceforth shall and will during my life support me in every manner, at their house on Hobkirk Hill, and provide me with all necessary food and sustenance, board, lodging, nursing, and attention, without charge, doth covenant and agree to and with Zachariah Canty, trustee, in the following manner, to wit: that I will stand seized and possessed to my own use during my life, and no longer, of the following named negro slaves, to wit (here follow the names and description of twenty-five slaves, including one called ' old Linda'), and their future increase and issue from this date; also of the following lands (here follows a description of the land); and from and immediately after my death to the use of the said Zachariah Canty, his heirs, &c., in trust, and upon the special trust and confidence, that the said Zachariah Canty, from and immediately after my death, will convey by proper deed or deeds to Mary Jane Exum, James Exum, Joseph Exum, and Eugene Exum, the children of Joseph J. Exum, deceased, one-half of the negroes above named, except old Amy and Jacob, and the one-half of their future issue and increase, to them, their heirs and assigns, forever, in consideration of my natural love and affection for them; and will stand seised and possessed of the said lands, and the one-half of said negroes, and one-half of their future issue and increase, and the negro slaves Jacob and old Amy (from the last of whom no service or labor shall be required by compulsion), to and for the use of Camilla F. Canty, the wife of James W. Canty, for her sole and separate use, not subject to the debts, contracts, or control of the said James W. Canty, and to the use of such person or persons as she shall nominate and appoint by deed or will, notwithstanding her coverture, and to the heirs, executors, &c., of the said Camilla F. Canty, forever.

"Witness my hand and seal, this 18th day of July, eighteen hundred and fifty. J. WILLIAMS. [SEAL.]

" Signed, sealed, and delivered
    in presence of
        " JESSE S. NETTLES,
        " WILLIAM NETTLES."

The execution of this deed was proven by one of the subscribing witnesses, and left for record in the proper office in South Carolina on the 30th of September, 1850, and was also recorded in the same year in the Probate Clerk's office of Yallabusha county, in this State.

The bill further charges, that the consideration of the deed is inadequate; that the Cantys were not related to Williams, but were strangers in blood to him.

That the said deed is null and void, because at the time of its execution John Williams was *non compos mentis;* that from excessive dissipation and drunkenness, and other causes, his mind had become so impaired, weakened, and destroyed, as wholly to disqualify and incapacitate him to execute said deed; that at the time of its execution, on account of his weakness of intellect, he was wholly and perfectly under the control, and subject to the influence of an old negress (belonging to him) named Amy; that the influence of this negress was unduly and fraudulently used by the Cantys to procure the execution of this deed in their favor.

It is further charged, that in March, 1851, a short time before Williams's death, that being still *non compos mentis,* and under the influence aforesaid, he made a will by which, after giving some small bequests to other persons (and which are not claimed by the complainants), he gave the residue of his estate to said Camilla F. Canty; that complainants are advised that this residuary clause might prejudice their rights and interest if permitted to stand.

The prayer is, that the covenant to stand seised and the will be annulled, and for a division of the slaves among the heirs of Williams.

The will of Williams is made an exhibit to the bill, and appears to have been duly probated and recorded in South Carolina. The will, after making several bequests of small value, gives all the residue of the testator's estate to Camilla F. Canty. It is dated the 16th of March, 1851.

The defendants demurred to the bill, and their demurrer was sustained, and the bill amended, in conformity to the decision of the vice-chancellor, by striking out all of it which related to the will of J. Williams.

The answer of defendants, Cantys, admits the heirship of complainants, the death of Williams, and the execution of the deed and

will, and the possession of the slaves in this State by Kelly. The respondents deny that Williams was *non compos mentis*, and they deny that they used any influence either through old Amy or otherwise to procure the execution of the deed. On the contrary, they allege that Williams and J. W. Canty had been very intimate from childhood, that Canty had rendered him many favors, and that Camilla F. Canty had made his clothing for him free of charge, and otherwise befriended him; that for this reason said Williams, before his removal from South Carolina to Mississippi, in 1846, had frequently proposed to J. W. Canty to give him all his property after his death, which propositions Canty declined; that in the spring of 1850, Williams, without the procurement or previous knowledge of the Cantys, returned to South Carolina; that he came in an open wagon, had little money, and was destitute of clothes suitable to his condition; that he drove up to their house, and proposed to remain with them, and also proposed to give them his whole estate after his death. That Williams then complained that his brother, Benjamin Williams, had induced him to remove to Mississippi, under a promise that he, Benjamin, would furnish him a plantation on which to live; that Benjamin Williams failed to do this, and turned him out of "house and home;" that he induced him (John Williams) to go his security; that his property had been seized for Benjamin Williams's debts; that Benjamin Williams had gotten all that he, John Williams, made while in Mississippi; that the heirs of Margaret Perkins, his sister (who are part of the complainants), had sued him for the possession of his body servant, Elias, when they were in truth indebted to him six or seven thousand dollars. That he complained that his relations had maltreated him, and expressed the wish, as before stated, to give his property, after his death, to the Cantys. – These propositions the respondents declined for several months, but finally J. W. Canty agreed to accept for his wife the one-half of his estate, persuading Williams to give the other half to his relations, the children of his nephew, Joseph J. Exum, who respondent, J. W. Canty, knew, had frequently, in his lifetime, befriended his uncle, John Williams. Respondent, Camilla F. Canty, denied all knowledge of the deed until it had been made and recorded, when it was left with her for safe keeping.

The answer saith further, that though John Williams, when he returned to South Carolina, was in feeble health, yet his mind was unimpaired, and that he was always considered to be the shrewdest of the brothers ; that after his return his health greatly improved, and he was able to visit his old friends, and also his old plantation, eighteen miles distant, where he frequently stayed for a week at a time; that both before and after the execution of the deed, J. W. Canty and his wife furnished him every comfort, and that for six months before his death he was very feeble, almost as helpless as an infant, and that they then showed him every kindness, and supplied his every want.    They admit that John Williams sometimes drank intoxicating liquors to excess, but deny that he was a drunkard, or that his mind was impaired or injured by intemperance; that they never heard his sanity called in question until they read complainants' bill.    The answer further states that the deed was duly executed and delivered on the day of its date.

Kelly's answer also denies the insanity of Williams, and denies that he holds the slaves as administrator of Williams, but as agent of Z. Canty.

The complainants filed a supplemental bill, in which they charged that J. W. and C. F. Canty never undertook or promised *to* support Williams during his life, as provided for in the deed, and that if such services were rendered they were gratuitous, and that there was no delivery of the deed.

To this bill there does not seem to have been any answer by defendants, nor was it taken for confessed.

The evidence is very voluminous, but the material parts of it will be found abstracted below.

It appears from the evidence that John Williams was born in Kershaw District, South Carolina, and lived there until 1846 or 1847, when he removed to Yallabusha county, in this State.    He remained in that county until the spring of 1850, when he returned to South Carolina, carrying with him three slaves, and leaving the balance here, in the possession of his agent, defendant Kelly.    After his return to South Carolina, he remained with the defendants, J. W. Canty and C. F. Canty, residing in a small house in their yard, until he died, in August, 1851.

For the complainants, the depositions of eight witnesses, residing

in South Carolina, were taken. All these witnesses but one had known John Williams from their infancy, and all of these knew him both before and after his removal to Mississippi. Several of these witnesses had been intimate with Williams before his removal to Mississippi, and had had business transactions with him. Two of these witnesses thought John Williams incompetent to attend to business before he removed to Mississippi. The others thought he was competent up to that time. They all agreed, that after his return from Mississippi he was incompetent. The facts upon which these witnesses based their opinion are as follows: He did not know the witnesses, after his return, when he met them, although they were well acquainted before his removal. He had been very intemperate, and was partially paralyzed, and was very feeble in body, and was unable to move about or feed himself without assistance. They could not understand him when he talked. One of the witnesses met Williams in 1850, on the road, riding in his buggy with his gun. Williams said he was going a hunting, and asked witness to go with him. He was then unable to ride horseback, and could not feed himself. To one of the witnesses he abused his brother, Benjamin Williams, and charged him, Benjamin Williams, with cheating him in transactions which the witness knew were beneficial to John Williams. One of the witnesses was overseer for J. W. Canty in 1850, and he thought John Williams's mind was not exactly sound, but could not say as to the extent of the unsoundness; he was confident, however, he was incapable of transacting business. John Williams stayed with the witness about three weeks on the plantation in the summer of 1850; during that time John Williams's conduct was strange. He would sit quietly for some time, and "then seem to be in a study;" at other times he would be very angry without cause, cursing Benjamin Williams. " He talked foolishly about everything," and abused Benjamin Williams a great deal. In a short time after this visit of John Williams, witness met him at J. W. Canty's residence, and John Williams did not know him. Most of these witnesses thought that his mind was so much impaired by drunkenness as to disqualify him from attending to business. Two of these witnesses thought J. W. Canty had great influence with him, and one of them speaks of " old Amy" interpreting for Williams.

The depositions of twelve witnesses, who were neighbors of John Williams in Yallabusha county, in this State, were taken on the subject of his competency. Two of these witnesses had known him in South Carolina, and the acquaintance of the others commenced with his removal to this State, and ceased with his return to South Carolina. All of these concurred in the opinion that he was incompetent to do business whilst in this State. It was also shown that he did not in fact attend to his business whilst here, except that he superintended his farm one year, when he made nothing.

All of the witnesses stated, as part of the grounds upon which they formed their opinion of his incompetency, that John Williams in conversation was disconnected and incoherent; that he would commence conversing on one subject, and before he got through with it would "skip" suddenly to another. Most of them stated that he would laugh "a childish," "foolish laugh," during his conversation, and without any "apparent cause," and would also "break off" his conversation on any subject "by cursing and abusing his brother Benjamin," without his name having been previously mentioned by any one.

In addition, the following incidents were related:—

One witness (Wynn) stated that in 1849, whilst John Williams was staying with his brother Benjamin, he heard J. W. on three occasions abuse his brother Benjamin as a rascal, and declare that "he would never put his foot in Ben's house again;" and in less than an hour afterwards witness saw J. W. in B. W.'s house, "seemingly as friendly as ever." On another occasion, this witness was at J. W.'s house, and the witness had some "liquor" with him, and asked J. W. to take a drink, to which J. W. made no reply, "but laughed immoderately." The invitation was repeated, and J. W. still made no reply, but laughed again. The laugh was "childish and foolish."

Another witness (Armstrong) stated that on one occasion, whilst he was present, John Williams made a present to a lady, and the next day a servant of J. W. came to the lady's house, saying he was sent by his master, and demanded pay for it. At another time, witness had borrowed J. W.'s gun and gun moulds. J. W. sent for them while witness was absent. The gun was sent, but the moulds could not be found. Witness's sister wrote to J. W., as she

Exum et al. *v.* Canty et al.

informed witness, that he, witness, was absent, and that she would write to witness immediately and ascertain where the moulds were, and send them to J. W. Witness was informed by his sister that on the next day J. W. sent for the moulds again.

Another witness (Robinson) stated that in the early part of the year 1850, he went to J. W.'s house to hire a negro, that J. W. had negroes to hire, and had a piece of paper upon which the names of the negroes and the prices of the hire of each was set down. He agreed with J. W. as to the price, but J. W. would not conclude the trade until he had sent for defendant Kelly. When Kelly arrived the trade was consummated. A short time afterwards, the negro so held run away ; and in a few days after he run away, witness saw the negro cutting wood near J. W.'s house. When the negro saw witness, he ran into the house, where J. W. was lying in a bed. There was only one door to this house. Witness went in and asked J. W. where the negro was, and J. W. denied knowing anything about him. Witness searched the room, and found the negro hid under the bed behind a box. Witness was unable to capture the negro, who ran out. Witness pursued him, and after the negro ran about the premises a short time, he went into the house again ; and witness followed, and again asked J. W. where he was, and he again denied any knowledge of the negro. Witness searched the room, and found the negro concealed in the box under the bed where Williams was lying. Witness then said to J. W. that he would whip the negro in his presence ; and J. W. told witness that if he would not do it, he would take the negro back and release witness from any liability for the services which the negro had rendered, to which witness assented.

Another witness (Fox) stated that on one occasion, in this State, J. W. rode up to his house whilst the family were at dinner. Witness went out and invited him to come in and dine. J. W. said "No." "He sat on his horse a short time at the gate, and then rode off without saying anything more."

Witness York stated that in 1848 he resided within one and a half miles of J. W., and in 1850 he resided three-quarters of a mile from him ; he met Williams every week ; was at Williams's house frequently, at least a dozen times. He recollects that on three occasions J. W. came to witness's house and asked witness his name,

and "who resided there." On one occasion he came to witness's house, and said there was a sheep in his field, and asked witness if it was his. At this time he also asked witness his name. He never knew witness when they met. Witness never knew J. W. to transact business. P. T. Williams, and afterwards J. Kelly (the defendant), managed his business for him. J. W. would never talk two minutes on one subject; would frequently commence talking, and call on "old Amy to finish the conversation."

Witness Pate knew Williams in South Carolina, and also in this State. Saw him several times in 1849 and 1850. Witness saw him the day before he started to South Carolina in 1850. Williams said he had made a will, which was recorded in Coffeeville, giving all his property to J. W. Canty; that he did not intend to give old Ben and his boys anything. He then laughed. "Old Amy," who was standing by, said "d—d old Ben." Witness thinks J. W. was under the influence and control of old Amy. His reason for so thinking is, that he would get drunk when he could get liquor. Yet witness was at his house on one occasion when J. W. had whiskey. "He could only get it when old Amy would let him." He asked for it frequently, but she would not let him have it until she got ready. Witness knew a slave named "old Linda," which belonged to J. W. She died in 1839. J. W. never had any other negro by that name.

Witness Conner stated that J. W., when drinking, was easily controlled and influenced. Old Amy could control him, and get him to do whatever she wanted. His slaves, Jake and Elias, could also influence him. He carried these slaves with him to South Carolina. He did not start with Jake, but Jake followed him, and went to South Carolina.

Witness Armstrong also stated that old Amy controlled J. W., but mentioned no specific instance wherein such control was exerted.

Witness Ingraham knew J. W. in South Carolina and in this State. Saw him about two or three weeks before he returned to South Carolina. His mind was then fickle and wavering. He applied to witness to borrow $2000. Witness agreed to lend it, if J. W. would give a lien on his property. Old Amy was present. He consulted with her about the matter, and finally agreed to give the lien. Thinks he was controlled by old Amy, and adopted what she

said. Witness afterwards declined to loan the money, because he did not think J. W. capable of contracting.

Dr. Ray, a witness for complainants, knew J. W. whilst he lived in this State; considered him "almost *non compos mentis;* he was very deficient in body and mind." Witness met him several times, and had some dealings with him. He was fickle, and easily imposed on; was afflicted with paralysis and rheumatism. Paralysis and intoxication for a number of years impairs the intellect.

Dr. S. Miller (a witness for complainants) stated that he knew J. W. in the early part of 1850. Witness attended on him while he was suffering under an attack of winter-fever. He then had very little mind, but this is not unusual in that disease. Witness saw him after his recovery. He told witness he was laboring under a spinal disease. Witness prescribed medicine for him, and he improved. The next time witness saw him, he was greatly incensed at what he called "the Williams stock." He was in a bad humor, and his mind was in a bad condition. This was soon after his property had been levied on to pay Benjamin Williams's debts. He was not then entirely sane; his mind was much shattered and impaired. His conversation was disconnected. He was not very competent to do business. Thinks his mind, however, had improved since the first time witness saw him. Paralysis and excessive drunkenness impairs the mind.

Drs. Means, Rhen, and Ball were examined as to the effects of intemperance and paralysis on the mind, and as to the symptoms of derangement, and they stated that the tendency of intemperance and of paralysis was to impair and destroy the intellect; and they mentioned, as symptoms of derangement of the intellect, incapacity of conversing connectedly on one subject, sudden transition from violent passion to good humor, inability of remembering names or knowing one's neighbors, and violent animosity against relations and friends.

It was also shown that there was no will of John Williams on record in Coffeeville, as he stated to witness Pate; and on cross-examination of the complainants' witness, it appeared that J. W. had, what is termed in the testimony, "a stoppage in his speech;" but none of the witnesses attributed the peculiarities in his conversation alluded to by them to that cause, but to want of reason.

The proof on the part of complainants showed that the property conveyed was worth about $15,000.

The defendants took the depositions of the following witnesses residing in Kershaw District, South Carolina :—

Richard Manning, who states that he had known John Williams for twenty years; that Williams often visited Mr. James W. Canty at his residence near Camden. Only saw him once after he returned to South Carolina, and took up his residence at the house of Canty. Williams, before he moved to Mississippi, when inebriated, was nursed and given every attention his condition required. It was in the spring of 1850 witness saw him. Witness thought him of sound mind; never saw anything about him when sober to indicate mental unsoundness. Williams regarded Mr. and Mrs. Canty his best friends.

John L. Manning states : I was acquainted with John Williams in Kershaw District, S. C., as far back as 1828; often met with him at public places, and lived with him for weeks together in the same house. Believed him to be of sound mind, very steadfast in his friendships, and positive in his dislikes. Did not see him in the year 1850. The relations between General J. W. Canty and John Williams were of the most friendly character. Williams always regarded General Canty as most men would regard a superior order of beings. He relied upon him, and was devoted to him. In 1841 or 1842, met Williams at Canty's house, and he then mentioned in indefinite terms his desire to leave Mrs. Canty property as a testimonial of his regard for her, which witness regarded quite in accordance with the feelings of regard and affection which Williams invariably expressed for Mrs. Canty. Canty's house was always open to Williams, and he spent there a large portion of his time. Williams was devoted to Canty's children, and they were attached to him. They lived upon the most friendly terms. Williams consulted General Canty upon business. Mrs. Canty had always a jocular and friendly word for him, and rebuked him for his intemperance, which he took kindly, and promising reformation. Williams had his apparel put in order by her people. She made various articles of household use for him, nursed him with tenderness in his sickness, and, in a word, performed the offices of an elder sister or mother. For all of which favors and kindness, witness often

heard Williams say that he loved General and ·Mrs. Canty more than any friends he had on earth. Their relations of kindness and friendly intercourse existed for more than thirty years.

The deponent is the Governor of the State of South Carolina.

John P. Richardson has been Governor of the State of South Carolina, twelve years a member of the State Legislature, and for several terms a member of the Congress of the United States. Had ample opportunities to know the mental capacity of John Williams. Knew him for more than twenty-five years, and always regarded him of sound mind' and understanding, when sober. Saw John ·Williams frequently during the years 1850 and 1851, and his mind was sound as usual. The only particular act by which witness could judge of his sanity was his calm and peaceful preparation for death. When witness saw John Williams after his return to South Carolina in 1850, his condition was that of great suffering and utter destitution, relieved only by the kindness and assiduity of his attending friends, General and Mrs. Canty, with whom he lived until his death, and always expressed the deepest gratitude for them. The relations between General Canty, Mrs. Canty, and John Williams, prior to his moving to Mississippi, were of the most intimate and friendly character, and John Williams then expressed his intention of giving his property to them. The house of General Canty, previous to John Williams's removal to Mississippi, was frequently the home of John Williams, especially in sickness or suffering, or after his seasons of intemperance, to seek that nursing, care, and attention he was sure to receive. During his last illness, John Williams received all, at the hands of General and Mrs. Canty, which the most intimate friends and closest kindred usually show each other, and which nothing but friendship, humanity, or religious duty would prompt or purchase. Mrs. Canty had and exercised an influence on his moral nature superior to that of any other person.

Williams never left General Canty's house for any length of time after his return from Mississippi. In witness's last conversation with him, Williams told him he had given all his property to Mrs. Canty (pointing to her at the same time), as some return for her great kindness, of which he had just been speaking. His condition was that of great debility and helplessness, arising from physical disability or partial paralysis, under which he had been laboring

from youth.   He was never drunk, that witness ever knew or heard of, after his return from Mississippi.   He was limited to such drinks, and in such quantities, as his physician prescribed.   His mind was as good as I ever knew it.

Often, when witness saw him, he spoke of the conduct of his brother, Benjamin Williams, to him, which he regarded as cruel in many ways.   He said his brother had involved him, and suffered his property to be sold, and reserved his own.   That General Canty and Mrs. Canty had an influence with John Williams, which influence was uniformly exerted for Williams's benefit and happiness.

Colonel James B. Richardson was many years a member of the Legislature of South Carolina; was well and intimately acquainted with John Williams about twenty years; much in his society; often at John Williams's house; often hunted with him; often met him at General Canty's house.   By frequent intercourse, he had ample opportunity of judging of his mental capacity, and never had the least doubt of the soundness of his mind.

Knew John Williams in 1850 and 1851, after his return from Mississippi, and his mind was not impaired.   Conversed much with him, and saw no difference in him after his return to South Carolina.   Williams, as far back as 1837, expressed his intention of leaving his property to Mrs. Canty.   General Canty once raised means for him, and prevented his property from being sold by the sheriff.

Thomas C. Richardson knew John Williams for twenty years. Knew him before he went to Mississippi, and after his return in 1850 and 1851.   Knew him intimately, and conversed with him much, and always regarded him as a man of sound mind.   In 1850 and 1851, his mind was sound as usual, and his deportment uniformly denoted soundness of understanding.   After his return from Mississippi, his physical condition was feeble, but he was mentally strong.   He lived at the house of General Canty from the time of his return from Mississippi until his death.   He expressed much dissatisfaction with Mississippi and his relatives there, and gave it as a cause of his removal to South Carolina.

J. B. Kershaw knew John Williams since 1842; drew a deed for him in 1850 or 1851, and also his will; made it his duty to ascer-

tain Williams's capacity for business. Considered him competent. His infirmities in 1850, physically, were great, but witness did not think his mind much affected. In 1842, he was eccentric and irritable, and he seemed to witness about the same way after he returned to the West. There was a difficulty in understanding Williams, owing to defect in conversation or speech, but Williams had no difficulty in comprehending anything said to him.

The consideration of the deed expressed in it was faithfully performed.

John Williams went to Mississippi in 1846, and returned in about four years, and came to the house of General Canty, and was there comfortably lodged and cared for in a house in the yard. Witness only saw him, in 1850 and 1851, at the execution of the deed and will, except that he saw him once during that time at a military encampment near Camden. Saw him but once prior to March, 1851, after his return to South Carolina. He was in Camden on horseback. Does not think Mrs. Canty's services were worth the negroes conveyed in the deed; the services were not capable of being estimated by a pecuniary standard.

From John Williams's condition in 1851, when witness first saw him, he is satisfied that nothing but kindness, friendship, and charity could induce any one to have him in their house.

Witness is a lawyer in Camden, South Carolina.

W. A. Ancrum has known John Williams twenty years. Lived upon terms of social intercourse with him. Saw him a short time before he died. His mind was as good as it ever was. The consideration of the deed made to Canty was faithfully performed. Witness always considered Williams capable of managing his own business.

William Nettles has known John Williams from infancy. Saw him in July, 1850, and thought his mind was good. Was a subscribing witness to the deed. No influence was exercised over him at the time. The deed was read over to him, and he said it was right. He seemed entirely rational, and was capable of understanding it. Mrs. Canty was not present. Does not recollect that any person was present at the execution of the deed but Jesse S. Nettles and himself.

McRae Bravord : Witness was present when a deed was executed

by John Williams in the presence of John Canty, Sr., Rev. Thomas F. Davis, Jesse Nettles, and William Nettles, but can't say whether deed Exhibit A is the one executed or not, nor at whose request he (witness) went; but such request was in the name of John Williams. Williams then seemed to be in his usual mind. Heard him say he knew what he was doing, and that he wanted to give his property to Mrs. Canty and the children of Joseph J. Exum. No undue influence was used in witness's knowledge. Don't know whether he was present at the first reading or not; heard no objection or alteration suggested. The consideration was expressed in the deed, and was performed. He visited the house of defendants afterwards, and is confident Williams received every attention necessary for a sick man. Don't know how long he remained in Mississippi, or when he returned. At the time of or after his return, he looked badly, and said he had returned on account of the bad treatment of his brother, Benjamin Williams, and complained very much of the treatment of his relations in Mississippi. Witness knows of no acts of kindness by Joseph J. Exum to John Williams.

Cross-examined: Williams was not confined to his bed, but was sitting up on the day the deed was executed. Was not raised up to sign the deed. Had no acquaintance with Williams in his youth. Feebleness and infirmity are the natural consequences of age. Has seen Williams intoxicated, but don't think his thirst was uncontrollable. Canty sometimes keeps liquors in his house, but can't say he always did. Thinks that disease of long standing, and excessive use of intoxicating drinks for a long series of years, are likely to weaken and destroy the intellect. Williams made the Cantys' house his home. Was there on the 18th of July, 1850. Does not believe he was under their influence. Williams knew the witness, and recognized him after his return; and he saw no acts of irrationality after his return. Was with him often enough to judge of the soundness of his mind, and, from his general remarks, was satisfied his mind was sound. He was capable before, after, and at the time of the making of the deed, of understanding its legal effect; and when questioned by those present, said he knew what he was doing, and that it was his wish to leave his property to Mrs. Canty and the children of Joseph Exum.

Neill McRae knew Williams for fifteen years. Had transactions

with him, and opportunities for knowing his mental capacity, and considered him of sound mind. In 1850, witness had frequent conversations with him about business in the West, in all of which he saw nothing to make him question his sanity. In 1850 he was in feeble health. Said his reason for leaving his relatives in Mississippi was their bad treatment towards him. The relations between Williams and Canty were quite friendly. Williams once showed witness some shirts and handkerchiefs, which he said Mrs. Canty had furnished him free of charge. Had heard him speak of giving his property to Mrs. Canty and her son, John Manning Canty, and that he had been so maltreated by his relations that he would leave them no more than they had got; and that Mrs. Canty had treated him better than his own relations. He spoke as if he had less regard for Benjamin Williams than any of the rest. Never heard him say anything against any of the Exums except Edward. He said they had not treated him well, and were trying to get his property, and were vexed because he would not let them do so. Witness thinks he had a desire to assist the children of Joseph J. Exum in some way, because said Exum had been kinder to him than any of the rest of the Exum family. Heard him express a desire to see his old place on Lynde's Creek, and he did go there and spend a night or two, and he expressed regret at seeing the dilapidated condition of the premises. Williams would sometimes take a drinking frolic, and then not drink any for a week or two. Witness has oftener seen him sober than drunk. Has seen him where there were spirits, and he not drink any. Continued disease and long intoxication would be calculated to injure the mind. Williams was not under the influence of the Cantys; thinks him indisposed to be influenced by any one. Witness knew old Linda. She died before he went to the West, and was a favorite with the Williams family.

Williams knew witness before he removed to Mississippi, and Williams easily recognized him after his return. Saw no acts of Williams to warrant any suspicion that he was not of sound mind. Witness can't say how often he was with Williams or saw him, after his return to South Carolina, but often enough to satisfy himself that his mind was sane. Thinks he was capable of understanding the deed.

Dr. Lynch H. Deas: Witness knew Williams from the time of his return to Camden from Mississippi; had no business with him, except as his medical attendant, and no other opportunity of judging his mental capacity. Considered his mind sound, because he exhibited no symptoms of unsoundness. Long-continued disease and excessive use of intoxicating drinks are likely to debilitate the mind, but not to produce insanity.

Henry Canty: Witness has known Williams from his earliest recollection, and his opportunities for knowing his mental capacity were good, from repeated interviews with him, and he firmly believes he was of sound mind.

Williams's mind was as sound in 1850, after his return, as it had ever been. Witness's reasons for believing him sane was, that he never saw him do or say anything contrary to sanity. On his arrival in South Carolina from Mississippi, he recognized witness and all his old friends whom he saw in witness's presence, and he spoke of occurrences both of pleasure and business, and in all cases he was correct in facts, and generally in conclusions, and his acts, like his narratives, were rational. In order to get money to supply his necessities, he hired out his negro man Jacob, and often collected the dues himself. Williams said to witness that his reason for returning to South Carolina was the unkind treatment of his relatives in Mississippi, for they had involved his property, and he was afraid if he stayed he should be ruined by them. Again, Williams was particular about his clothing, without showing any of that peculiarity and eccentricity of dress which is sometimes connected with derangement of mind. Never saw or heard of any undue influence exerted over him, and, judging from his disposition, does not think any undue influence could have been exercised over him if desired. Williams was kindly treated at Canty's. Witness is a physician, and son of J. W. and C. F. Canty.

Cross-examined: When Williams first arrived in South Carolina he was a paralytic, but by kind nursing improved much before the 18th of July, 1850; enough to sit up, and walk a little with the assistance of a stick, and ride on horseback. Williams, from witness's earliest recollection, had physical infirmities, but enjoyed general good health. He was fond of his drink, but not an habitual drunkard. It is not unusual for the mind to outwear the physical

man, remaining vigorous and clear up to death. Excessive use of intoxicating drink for a long period will usually weaken, and sometimes destroy the intellect; and the combination of both disease and such excessive use of spirits, would be destructive of the intellect. Williams was of stubborn will, and could not be influenced as regards the disposal of his property. The lands mentioned in the deed are poor pine lands, worth about $1500. Williams had Elias and Amy to wait on him.

R. M. Canty: Witness has known Williams from boyhood. Had opportunities for knowing him from almost daily conversations with him. As far as he could judge, his mind was perfectly sound. Was as good in 1850 as it ever was. Recognized witness as soon as he saw him, after his return to South Carolina. Williams spoke of the bad treatment of Benjamin Williams in Mississippi, and he spoke feelingly about his old place, and inquired if it had gone to ruin, and soon after visited it. He also rode to Camden. Always seemed glad to see his old friends, and enjoyed their society. The Cantys treated Williams kindly. Williams had been very intimate with J. W. and C. F. Canty; he usually made their house his home, when he came to Camden on business or pleasure; and witness has known Mrs. Canty to make clothes and give them to him. Williams was feeble when he first arrived, but improved. From witness's earliest knowledge, Williams had sickness, but his general health was good. J. W. and C. F. Canty are not related by blood to Williams. The lands mentioned in the deed are worth $1500.

Witness has heard the defendants speak of Williams as sane, but never that he had lost his mind or grown childish, or that he was incapable of managing his property. Williams lived about a year after the 18th of July, 1850. Does not remember his condition on the 18th of July, 1850, but his health was generally good that summer, and so continued until the spring of 1851. Never saw any acts of irrationality or any indications of unsoundness of mind.

Jesse Nettles: Witness was acquainted with Williams from his childhood. Had frequent transactions with him, and knew him intimately before he left South Carolina. Always considered his mind very good; it was sound in 1850; though his speech was very defective. In speaking with him about things which occurred long before, he would remember them accurately; and if any name

was mentioned, as being one of the persons present on any occasion which was not right, he would correct it; and if anything was related as happening on any occasion which was not right, he was prompt to correct the statement. This was after his return from Mississippi. He could tell every man who had befriended him, and every one who had imposed upon him, from the time he first went into business for himself. Williams talked a great deal about these matters, and his resentment seemed directed principally against Benjamin Williams and J. P. Dickinson. Witness attested the deed; he signed it at the request of J. W. Canty. Williams was perfectly himself, and knew what he was doing. In the first instance, when witness went to attest the deed, old Amy called witness to Williams's room as he was riding into the yard. Williams was alone with Amy; he had in his hand a draft of a deed which had been prepared for him, and requested witness to read it to him. He made no objection until the names of the negroes were read. He stopped witness, and said that part of it was wrong; that the names of some negroes were mentioned that had been sold in Mississippi; said he would not sign that, but another must be written, on account of the negroes improperly contained in it. That deed was the same as that afterwards executed, except that the names of the negroes sold were left out. Williams requested witness to come next morning and read the new one, which was to be prepared for him, and witness did so, no one being present but Amy. After the deed was read, he asked if Elias was included. Witness said no, he is not; and Williams said he would sign it, and it was executed that day. No undue influence was used or attempted. The consideration of the deed, in part, was his support for life. It was performed by the defendants, J. W. and C. F. Canty.

Witness has read letters from J. Williams, addressed to him or J. W. Canty, proposing to give either of them half of his property if they would support him his lifetime. Williams returned to South Carolina in 1849 or 1850. Thinks he was in tolerably good health at that time, but had partially lost his speech. One day, at witness's house, he said Benjamin Williams had treated him shamefully, had deceived him. He flew into a passion whenever B. Williams's name was mentioned. On the day above named, he said

B. Williams was the d—dest rascal that was ever born, and cheated him not only out of what he made, but wanted to get his negroes. J. J. Exum did befriend J. Williams. He was at great expense and trouble about Williams's affairs. He came back from Mississippi to save his property, when it was under execution, and saved Williams from being broken up entirely, by selling his land for him. Before Williams left for Mississippi, he proposed to give half his property to witness or General Canty, if they would support him. He had a will in his possession already executed in favor of J. J. Exum's children, and said that J. J. Exum was the only one of his relatives who had ever done anything for him.

Cross-examined : Witness is a bank officer, and no ways related to defendants. Witnessed the deed. His son William, and A. G. Baskin were present at the time of the *execution of* the deed. Williams was feeble and in bed. He raised himself up and turned his feet out of the bed. Sat up, and had a table brought to the side of the bed. Williams was generally confined to his bed after that time. Williams was always afflicted, but had a good constitution ; he could stand a great deal of fatigue. He was about fifty years of age in 1850; and was fond of liquor, and would frequently take too much. Witness never saw him drunk after his return to South Carolina. Mrs. Canty restricted him in this respect. Williams recognized witness when he returned from Mississippi, and was glad to see him. Never saw any acts of irrationality or unsoundness of mind, and thinks Williams well knew the effect of the deed when he signed it.

Edward B. Canty has known Williams from his earliest recollection; had frequent interviews with him, both before he went to Mississippi and after his return, and his mind was as good after as before. Witness judges from almost daily conversations. Witness never saw him do anything contrary to what a sane man would do. He recognized witness after his return as soon as he saw him. He was fond of hunting, and very particular with his guns, and would not let them go out of his room without his permission. He had a gold watch. He knew when it would get out of order, and would send it to be repaired, but would not let the watchmaker keep it very long.

He enjoyed a joke; laughed at anything amusing, as any other

rational being would do.  He remembered the military encampments in his former days, which were then common in South Carolina.  There was one while he was here; and he desired to see it, and did go.  On seeing a cock pass his door, one day, he ordered it to be caught, and its comb and gills cut; and gave as his reason that he liked to see them so, because he used to have his so.  Witness saw Williams nearly every day, during his stay in 1850, and never saw him in a state of insanity.  Witness is a son of J. W. and C. F. Canty.

Cross-examined: Williams was not confined to his bed for weeks or months before the signing of the deed, but by the aid of a stick was able to walk about; and sometimes rode about, and so continued until the spring of 1851, when his health began to decline.  Judging from his condition before and afterwards, I should think he was capable of understanding the legal effect of the deed, when it was executed.

Horace Whittaker was acquainted with J. Williams for more than thirty years, and frequently had business transactions with him. Saw him many times in 1850, and from frequent intercourse with him, thought his mind sound.  Saw Williams a day or two before and after the execution of the deed, and his mind was sound.  Often spoke of the bad treatment of his brother Ben and family; said he would not give them anything.  Witness knows *of* Williams proposing to give defendants, J. W. and C. F. Canty, his property, if they would support him, before he went to Mississippi.  Witness cannot specify any particular acts of sanity; but never saw an act which would induce him to believe he was insane.  Witness was almost constantly with Williams after his return to South Carolina, and up to the hour of his death.  Witness is a cousin to J. W. Canty. Williams recognized witness on his return to South Carolina.  Witness is confident he was capable of understanding the deed.

S. Amelia Canty: Knew Williams from his return to South Carolina to his death.  From frequent interviews, had a good opportunity of knowing his mental capacity: his mind was good; he recognized friends whom he had not seen for years.  Often spoke to witness of her father, who died in 1836; said he should have known witness from her resemblance to her father, and related little incidents between them of which witness had heard others

speak. In the summer of 1850, he asked witness to make a memorandum of some accounts against the Williams family, which she did. From these acts, and his never doing anything irrational, witness thought him sane. He was affected with paralysis of the tongue; and, on this account, particularly when vexed, his speech would become so much impaired as to render it a difficult matter to understand him; but when not angry, he took an active and intelligent part in the every-day conversation of the family and his friends. As another incident, witness mentions that he was fond of his guns, and was particular to have them cleaned and kept in perfect order. Defendants Canty treated him with every act of kindness.

Witness is the wife of G. Canty, and daughter-in-law of J. W. and C. F. Canty.

Witness has never heard Williams's sanity called in question by any one in South Carolina; never saw or heard anything approaching irrationality.

W. R. Taylor: Knew Williams; thought him sane; frequently talked with him about hunting; he seemed to understand witness perfectly; enjoyed a joke heartily. Witness could not understand him, but he conveyed his pleasure or displeasure by laughter and glances of the eye. His eye was clear and bright, and indicated intelligence of an ordinary degree, but not anything of a high order. Williams's physical condition was feeble when he came to Canty's. He was unable, perhaps from paralysis, to walk. He had to be carried in the arms of some one when he was removed.

A. G. Baskin: Witness knew Williams from his infancy; was born and raised within three miles of him. Williams owned a saw and grist mill, up to 1842, to which witness went about once a week, for six or eight years. Has often seen Williams there, and witnessed his sales of plank and calculations of the same, in which he was as accurate and astute as any man. Has seen him at his father's from three hundred to five hundred times, and the great disparity between his physical and mental capacity induced witness always to observe him closely. Witness had two business transactions with him: one J. P. Dickenson, in 1842, had a mortgage on some of his negroes, and employed witness to collect the money on the mortgage; and on that occasion he manifested as much shrewdness and sense as

any man.    The other transaction was when witness presented an account he owed his brother William Baskin; which he paid, and was then as sane as ever.    This latter was in 1845.    Never saw him any more till 1850.    Besides these reasons, witness states the following, which, in his judgment, placed his sanity beyond question. A few days before the 18th of July, 1850, witness prepared a deed (exactly like the one marked, except as herein stated), and went up to witness it with Jesse J. Nettles.    Nettles and witness went to Williams's house,—the one which General Canty had built for him,—in the yard; he recognized them at once, and spoke of old times.

Witness stated to Williams that he had prepared the deed which he understood he had desired; and witness commenced reading it over to him, when he said, "Stop, that is wrong.    I don't want Elias included.    I wish to retain the future control of him."    Which prompt detection of the error confirmed witness at once in the opinion that his mind was as good as ever.    Witness then asked him if he should prepare another according to the changes indicated, and he said yes; and witness did so.    Witness is a lawyer, and was once employed by Mrs. C. F. Canty and General J. W. Canty to go to Mississippi to investigate this matter, and did confer with Messrs. Aldridge and Herron, but is not counsel for them now.

John Williams was a man of great determination of purpose and stubborn will, and could not have been influenced in regard to the disposition of his property.

Miss H. H. De Leon knew Williams, and thought his mind sound.    Heard him talk, and thought him perfectly sane.    Saw no acts nor heard any words which indicated unsoundness of mind.

Rev. Thomas F. Davis knew John Williams only a few weeks before his death.    Attended him as a minister of the Gospel.    He could scarcely converse at all, but seemed to understand any point I pressed upon, which is the reason I give for thinking him sane. I could not see that his mind was at all times acting, but when called out he seemed to understand.

Upon final hearing, the vice-chancellor dismissed the bill, and the complainants appealed.

*W. S. Eskridge,* for appellants,

Filed an elaborate argument, commenting upon the testimony; and he cited and commented upon the following authorities:—

1. A court of equity will relieve, if the proof shows that the grantor was of very weak intellect. 1 Story Eq. § 234; Story on Cont. § 500; 6 Wheat. Cond. S. C. R. 236; 3 Leigh R. 567; 3 Mad. 191; 9 S. & M. 94.

2. The proof shows that Williams was insane. 3 Cyclopædia of Med. 318; 1 Ib. 325; 1 Beck Med. Jur. 560; Forensic Med. 32.

3. A covenant to stand seised can only be supported by blood or marriage. 2 Bl. Com. 338.

4. A covenant to stand seised if executed to trustee who is a stranger, is void for want of relationship between the parties. 16 Johns. R. 515.

5. If it be received as a bargain and sale, it is void for want of consideration. 16 John. R. 47.

6. It cannot operate as a deed of gift. 2 How. Miss. 745; 4 Ib. 221; 2 Cushm. 58; 2 Kent's Com. 438; 2 Bl. Com. 356.

7. Love and affection are good considerations only between near relatives. 2 Bl. Com. 297; Ib. 444; Story Eq. § 354.

8. The deed is void on account of gross inadequacy of price. Story Eq. § 246; Story on Cont. § 432; 3 Leigh. R. 567.

*W. Brooke*, on same side.

On the testimony in this cause, my associate, Mr. Eskridge, has filed an elaborate argument, which will dispense with any reference on my part to the question of insanity or mental imbecility.

The plaintiffs in error are the heirs-at-law of John Williams, deceased. They are entitled to his property, unless he made some valid disposition of it to others in his lifetime, either by conveyance or by last will and testament.

In the original bill filed, it is charged that he made a conveyance or covenant, to stand seised to the use of defendants in error, and also that he made a will, making the same or a similar disposition of his property. Both of these, it is alleged, were executed while he was *non compos mentis*, and they are sought to be set aside by the bill. The bill was demurred to so far as the will is concerned, and demurrer sustained, and amended by striking out all that portion which relates to the will. The covenant to stand seised is the

only instrument before the court whose validity is to be adjudicated upon.

I submit that if it is what it purports to be, a "covenant to stand seised," it is invalid so far as Mrs. Canty is concerned, for the want of the proper consideration to uphold it. A covenant to stand seised can only be made on consideration of blood, that is, blood relationship, or the natural affection arising therefrom, or marriage. 2 Blk. Com. 338. Mrs. Canty, as admitted in the answer, was a stranger to the grantor both as to blood and marriage relationship. See also 16 Johns. Rep. 515; Story Eq. § 334; 2 Kent, 438, *et seq.*

The application of this rule would be stronger in case of personalty than of realty, because immediate possession is of much more importance in deeds of gift of the former than of the latter. The title to personalty passes with the delivery; and when no valuable consideration is paid, cannot pass without it. *Thomson* v. *Thomson*, 2 How. Miss. 737; *Marshall* v. *Fulghan*, 4 How. Miss. 216.

But I contend that this instrument is of a testamentary nature, and cannot divest the plaintiffs in error of their right to the property of the testator, because it was not proven according to the laws of South Carolina, where it was executed, and for that reason incapable of ever being probated. The rule of distinction between deeds and wills is laid down in *Wall et al.* v. *Wall*, 1 George, 96, and is as follows: "The determination of the legal character of instruments of this kind depends mainly upon the question whether the maker intended to convey any estate or interest to vest before his death, and upon the execution of the paper; or, on the other hand, whether all interest and estate whatever were to take effect only after his death. For the most part, that is governed by the provisions of the instrument, which may sometimes be aided by the concurrent circumstances of its execution; and the rule is well established, that whatever may be the form of the instrument, or the circumstances of its execution and delivery, if upon the whole the intention was that it should have only a future operation after death, it must be held to be a will; and in such case, it is immaterial whether the maker calls it a deed or will, for it must, nevertheless, have that effect which the law gives it."

Tested by this rule, the instrument in question is clearly testa-

mentary in its character. No title or interest whatever passes to the beneficiaries during the life of the maker. Its whole effect and operation, both as to the title of the property and its use and enjoyment, are suspended until his death. It is, in its nature, essentially different from the instrument referred to in the case cited. That purported to be a deed in consideration of natural love and affection, and also for a nominal moneyed consideration. It grants, bargains, and sells the property embraced in it to the grantees. It conveys an interest *in præsenti*, to be enjoyed *in futuro*, and the "handing over" of the property only is postponed till the death of the grantor. The instrument in question—the one at bar—has none of these characteristics of a deed; nothing is granted, bargained, or sold *in præsenti*—everything—title and enjoyment, is to take effect after the death of the grantor. True, as to the Cantys, it expresses a consideration: it is made a consideration that he shall be supported, &c.; but bequests in last wills and testaments are frequently made in consideration of past or future favors. The sole and entire operation of this instrument is to be after death; and therefore, according to the rule cited, it must be held to be a will. The opinion of the court in *Wall* v. *Wall*, is predicated upon the facts that the instrument "conveyed the present right to property to be enjoyed in possession at the donor's death." It is essential to a deed of gift, or of bargain and sale, that it should take effect in interest upon its execution, though the right of possession or of enjoyment may not take place until the happening of a future event. 1 George, 99.

If these premises are correct, the conclusion must necessarily follow, that the instrument, being testamentary in its character, cannot divest the heirs-at-law of their rights until it is probated as a will, which, according to my understanding of the laws of South Carolina, can never be done under its present form of proof. It was there (not judicially) treated as a deed, and recorded only in the office of the clerk of the Court of Common Pleas.

*F. M. Aldridge,* for appellees.

1. The question as to the consideration of the deed cannot be considered, because that point is not made in the bill of complaint. *Bowman* v. *O'Reilly,* 2 George, 261; 7 Ired. Eq. 152.

2. What is the character of the instrument under which we hold the property in controversy ?

Uses may be raised either upon a pecuniary consideration, or upon what is called a good consideration, which is that of blood or marriage. Whatever be the form of conveyance, creating and transferring a use upon the former consideration, it is a bargain and sale. Sanders on Uses, 64.

Is the consideration, then, sufficient to support the deed ? It will be observed that a consideration may be valuable so as to effect a bargain and sale, and still not be regarded as valuable in contemplation of the statute 27 Elizabeth. Sanders on Uses, 74. Services performed are valuable. 9 Wendell, 615. Money is but the representative of labor.

3. Although a court of equity will not aid a volunteer, by denying a specific performance, yet if the estate has passed by law, equity will support it against the donor as much as if the most solid equivalent had been paid. 1 Vernon, 100; 2 Story Eq. Jur. 318, § 973 ; *Burn* v. *Winthrop*, 1 John. Ch. Rep. 334. And it will be seen the estate has passed, and is in possession of the parties defendants.

A deed requires no consideration. *Walker* v. *Walker*, 13 Iredell, 335; *Burn* v. *Winthrop*, 1 Johns. Ch. 334.

The deed may operate as a deed of gift. The court will look to the substance, not the shadow of a conveyance, and seek the intent. *Bell* v. *Scammen*, 15 N. H. 394.

The consideration need only move from one party. Roberts on Conveyances, 108.

As to insanity or mental imbecility, only a few of the rules can be referred to, by which it will be seen that this deed will bear the most rigid scrutiny.

A deed is tested by the same rule in relation to the grantor as a will. *Greer* v. *Greer*, 9 Grattan, 330.

Rules to judge of sanity :—

1. By the instrument itself.

2. By conversations before and after the instrument is executed.

3. The opinions of the draftsman of the writing and the witnesses who attested it. English Ecclesiastical Rep. 51, 58; 3 Mass. 236 ; *Brock* v. *Luckett*, 4 How. Miss. 483; 9 Grattan, 330.

It is not necessary to show that a person who had once been deranged had, at the time of making a will, regained all the powers of his mind which distinguished him before the malady. 3 Starkie, 1712; 11 Vesey, 11.

It is only necessary to show that he knew his property, and the objects of his bounty. *Stevens* v. *Vancleve*, 4 Wash. C. C. Rep. 267. To which case the court is particularly referred, as to all the points above.

Will John Williams stand the test of these rules ? It will be seen in every case referred to, that a stronger case of mental weakness was made out than in this.

We will not argue the facts, but simply call the court's attention to some leading facts. Most of the proof of the appellants is confined to this State, and the testimony of appellees is that of persons capable of judging at a subsequent period. In this respect the case presents very similar features to that of *Brock* v. *Lucket*, in 4 Howard.

All the parties who associated with John Williams at the date of the execution of this instrument prove his capacity, the draftsman of the deed (an intelligent lawyer), and the subscribing witnesses, and in addition to this, a number of persons of experience and intelligence, who had long known John Williams, and lived upon terms of great intimacy with him. See abstract of depositions of Richard Manning, John L. Manning, John P. Richardson, and James B. Richardson, and many others, all of whom place the question of the capacity of Williams beyond controversy.

It may not be amiss to refer to the high character of the witnesses, as a fact showing the impossibility of bias in their minds, and also to their intelligence and capacity to form a correct opinion.

The conveyance was made also in pursuance of a long-settled purpose often expressed, that of gratitude to Mr. and Mrs. Canty for their kindness, and affection for the Exum children because of the services of their father in saving his property.

Reasons are also given for hostility towards his relatives, complainants in this suit. It was a rational act rationally done.

Even if it was admitted, which we do not admit, that John Williams was incapable of executing the conveyance in this State, the

witnesses in South Carolina show that he had recovered. He was there able to ride on horseback, and ride often to Camden, a town in the vicinity. But the witnesses in this State do not prove mental incapacity or insanity. Many of them, when they assign their reasons, show that Williams was a man of astuteness. York, examined by complainants, says Williams never knew his name, but always asked his name. On one occasion, he came to his house and asked his name, and then told him his sheep were in his field, and he desired him to get them out. It would seem Williams, from some cause, assumed not to know him.

Luke Robinson says, when in this State, he hired negroes of Williams; and states a reason for believing Williams insane, which shows the reverse. It is said he kept a memorandum of the price of his negroes when he was hiring, and generally sent for a neighbor to see the business transacted. This, so far from indicating insanity, shows the reverse.

Armstrong thought him insane because he made a gift, and afterwards forgot it.

All the testimony in this State amounts to nothing; and, however strong it might be, it is fully rebutted by witnesses who knew Williams subsequently.

We will not elucidate this point.

One other point. The bill of the complainants discloses the fact, that there is a testamentary disposition of the property in controversy of later date than the deed. The deed, if vacated, could not benefit complainants, as it would be disposed of by will,—a sufficient cause to dismiss their bill of complaint, and was good cause to sustain the second demurrer to the bill.

The propriety of sustaining the first demurrer to the bill, is not questioned by complainants' counsel.

But it is insisted here for the first time, that the instrument is testamentary in its character. We insist that this point cannot now be made, because the bill makes no such allegation; but refers to the instrument as a deed, and attacks it as a deed, upon the ground of the insanity of the grantor, and the inadequacy of the consideration. *Bowman* v. *O'Reilly*, 2 George, 261; *Fatheree* v. *Fletcher*, Ib. 265.

The instrument being that of a bargain and sale, for a valuable

consideration, the title passed out of the grantor, while he reserved the use during his life. The deed says, the trustee is to convey at his (Williams's) death. Convey what? The title, which passes from the grantor by the deed. If the objections urged by appellants in their brief be valid, there could be no such instrument as a covenant to stand seised.

One other point. The complainants all sue as heirs of the brothers and sisters of John Williams, and do not allege that there is no administration upon the estates of their ancestors, or that the debts of the respective estates are paid, so that an administration is unnecessary. *Browning* v. *Watkins*, 10 S. & M. 485; *Miller* v. *Alexander*, 2 Gill & Johns. 226; *King* v. *Marshall*, 2 Cushm. 90.

*D. L. Herron*, on same side.

The first point presented by the record, in this case, is the demurrer to complainants' bill.

1. There is no point better settled by this court, than that the personalty of an intestate belongs to his administrator. If, as is set up in complainants' bill, J. Williams was *non compos mentis*, his will was invalid, and he must have died intestate, and the property in controversy in this suit (being personalty), went to his administrator, and not to complainants, as heirs, and they cannot maintain this suit. *Browning et al.* v. *Watkins et al.*, 10 S. & M. 485; *Marshall* v. *King*, 24 Miss. R. 85, 86.

2. But again, the bill upon its face discloses a valid outstanding will of John Williams, with a residuary clause, giving the whole of his property undisposed of to defendant, C. F. Canty; and, as such residuary legatee, she would take whatever by lapse, invalid, disposition, or other casualty, might fall into the residue of the estate, after the date of the will. 3 How. Miss. 340; 2 Roper on Leg. 453. This being true, even admitting that this deed is invalid, I should like to know what rights the complainants would have to the property?

3. But on the question of capacity of John Williams to make this deed. Some capital is attempted to be made out of what counsel call the gross inadequacy of the price paid. By reference to the deed, it will be observed that it is a covenant to stand seised; or, as complainants in their bill call it, "a deed of gift," in con-

sideration of love and affection, and sustenance, care, and attention already rendered, and to be rendered free of charge, the remainder of his life. The law does not require the same capacity, as it does to trade or manage his affairs, for the reason, that in the one, a person of weak understanding in dealing with others is subject to the influence of the cunning and adroit representations of the shrewd tradesman, who is always seeking whom he may devour; but in the other, in the absence of all undue influence, he has merely to consult his own inclinations, and determine his preference among the objects of his bounty.

4. Nearly all the evidence of complainants amounts to nothing more than the opinions of witnesses, who are not physicians, and cannot be considered by the court. 1 Phil. on Ev. (Cowen & Hill notes), 759; 9 Yerger, 329.

But perhaps it may be replied, or asked, if this agreement does not also apply to much of the evidence of defendants? I answer no, for the reason stated by Dr. Deas, one of the defendants' witnesses, that the books do not give or define the symptoms of sanity. As well might they attempt to give symptoms of health. A man is well when he has no symptoms of disease,—a man is rational when he exhibits no signs of irrationality; and all the witnesses for defendants gave this reason for their opinions.

5. The sanity of Williams, the grantor, is presumed until the contrary appears, *à fortiori* when it is proved by complainants' own witnesses that his mind was undoubtedly sound before he went to Mississippi. See Wm. Kirkland's deposition. 5 Johns. 144; 1 Peters, 163; 4 Cowen, 207; 4 Wash. C. C. 262; 9 Mass. 225.

6. As a necessary consequence of this legal presumption, unless clear, decided, and undoubted insanity has been once established (which is not pretended), no mere doubtful or equivocal acts, however numerous, are sufficient to prove insanity. 5 Engl. Ecclesiastical Rep. 224.

7. In considering this question, it is impossible to lay down any particular definition of insanity founded on symptoms, and make every man insane who might happen to come within the range of its application. This would have the effect to make a large portion of the human family madmen. 7 Engl. Ecclesiastical Rep. 550.

But it is absolutely and essentially necessary to look to the pecu-

liar circumstances of each case as an individual, and judge from his whole character what was the state of his mind, not only at the time of the execution of the instrument, but at the different stages of his life.

But while it is true that no particular definition founded on symptoms can be laid down, the most distinguishing feature of an unsound mind is the prolonged departure, without adequate external cause, from the state of feeling and mode of thinking usual to the individual in a state of health and of sound mind. 7 Engl. Ecclesiastical Rep. 551.

Looking to the peculiar circumstances of this case, we find that John Williams was an afflicted man, and, as a natural consequence, would be more or less petulant, whimsical, and capricious. He had no children, and though not an habitual drunkard, frequently drank to excess. He had been much harassed by being involved as security for his relations, and, as was natural, he was soured towards them ; and I submit that there is not one equivocal act or declaration, which is testified to by the witnesses for complainants, which may not be referred to one of these, or some other peculiar circumstance or idiosyncrasy of his mind ; and when considered with reference thereto, will appear natural and rational.

8. But do all these acts mentioned by the witnesses amount to anything more, at farthest, than mere doubtful or equivocal acts ? If not, and (as will be admitted) no decided and undoubted state of insanity has ever been fixed on John Williams, they are insufficient, and complainants have failed to make out their case.

9. But the preponderance of evidence is in favor of the sanity of Williams. Twenty-two witnesses (including the attesting witnesses) swear to the fact, and only twelve give their opinions against it, and some of these do not pretend to say that he was insane.

10. On the point of the consideration, the general rule that a deed will never be laid aside, if by any construction it can be made good, judges of later years have had a greater consideration for the passing of the estate, which is the substance, than the manner held, which is the shadow. *Tomlinson* v. *Dighton*, 1 Peere Wms. 163 ; Shep. Touchstone, 86.

And if a deed cannot operate in the precise way in which it is

intended to take effect, it shall be construed in another, if in this other it can be made effectual. 2 Parsons Contracts, 15.

Again, all deeds shall be construed most strongly against the grantor, and most favorably for the grantee. 9 Wendell, 611.

It was not necessary for the consideration to be mentioned at all, nor was it necessary that anything should be paid or done ; a promise to pay, or to do, is equivalent. *Rogers* v. *Eagle Fire Company*, 9 Wendell, 644.

In this case, the expression, " in consideration of the performances hereafter mentioned," was held sufficient to uphold the deed as a bargain and sale.

I grant that there are some authorities which hold, that if a man, in consideration that A. will pay his debts, covenants to stand seised to the use of A., no use will arise till the consideration be executed. 3 Comyn Digest, 279. But this authority cannot apply ; for, as will be seen by reference to the deed, the consideration had at least in part been performed.

HANDY, J., delivered the opinion of the court.

The appellants, as heirs-at-law of John Williams, deceased, filed this bill in the District Chancery Court, at Carrollton, against the appellees, for the purpose of setting aside and annulling a deed of conveyance made by Williams, for the benefit of the appellees.

The substance of the bill is, that the deceased died possessed and seised of a large personal and real estate, in this State, and in the State of South Carolina; and that, some months before his death, he was prevailed upon by the artifice and undue influence of the appellees, to execute an instrument of writing, on the 18th July, 1850, to the following effect: In consideration of his regard and good-will for James W. Canty and Camilla, his wife, and in consideration that they had theretofore supported him at their house, and would thenceforth during his life support him, and provide him with all necessary board, lodging, nursing, and attention, without charge, he covenanted and agreed to and with Zachariah Canty, trustee, to stand seised and possessed to his own use during his life, and no longer, of certain specified slaves and lands ; and from and immediately after his death, to the use of the said Zachariah Canty, trustee, who, immediately after the grantor's death, shall convey to

the children of Joseph W. Exum, one-half of the slaves named, in consideration of his natural love and affection for said children; and the lands, and one-half of the slaves to and for the use of Camilla F. Canty, the wife of James W. Canty, for her sole and separate use, &c.; which instrument was executed, acknowledged, and recorded in the State of South Carolina, and also was recorded in Yallabusha county, in this State, where the slaves were. The bill alleges that the consideration for the conveyance for the benefit of the appellees is inadequate; that Camilla F. Canty is not related to the deceased, either by blood or marriage; that the instrument of conveyance is null and void, because John Williams was, at the time of its execution, *non compos mentis*, which condition was caused by the excessive use of ardent spirits, and other causes; and that James W. Canty and his wife, taking advantage of his imbecile and childish condition, by undue influence and fraudulent means, prevailed upon him to execute the instrument; that Zachariah Canty is but the trustee for the complainants for such of the slaves as are conveyed to their use, and that the use in their favor carries with it the right of possession to them, but the slaves are now in the possession of James Kelly, the administrator of Williams, in Yallabusha county, &c.

The amended bill alleges, that neither Canty nor his wife ever undertook or promised to perform the services and offices for John Williams, mentioned in the deed; and if such services were rendered during the remainder of his life, that they were rendered gratuitously, and not under any contract with Williams for that purpose. It further alleges that the deed was never fully executed, and that it was never delivered by Williams, or by any one authorized by him.

The answer of Canty and wife admits that there was no relation of blood or marriage between them and Williams, and the execution and delivery of the deed; but denies that he was *non compos mentis* at the time of its execution, or incapable of executing a valid disposition of his property, or that any fraud or undue influence was used by them to induce him to execute the deed, either directly or indirectly; states that, before Williams left South Carolina, in 1846, and came to Mississippi, he had received many acts of kindness and attention from the respondents; and, after his return to

South Carolina, in the spring of the year 1850, he lived at their house, and received every attention and comfort until his death; and insists that the deed is valid, and that a valid title passed in virtue of it.

The answer of the administrator in this State denies that he holds the slaves mentioned in the deed, as administrator of Williams, and states that he holds them as agent of Zachariah Canty, the trustee in the deed, and is accountable to him for them.

Upon the hearing, the bill was dismissed, and from that decree this appeal is taken.

Before we proceed to consider the main question presented by the bill, it is necessary to notice some legal objections which are urged in behalf of the appellant against the validity of the deed under which the appellees claim title.

First. It is objected that the deed is invalid as a covenant to stand seised, for want of a sufficient consideration; and, as there was neither the relation of blood nor marriage between the parties, that the consideration of natural love and affection, or the like, will not support the deed. But the deed states a further consideration of services rendered to the grantor before its execution, and to be continued to him during his life. That is clearly a valuable consideration. As to the past services for his support and comfort, the consideration had already been received by him; and as to future care and support, that was a condition subsequent, which is shown by the evidence to have been fully and faithfully performed by the appellees. It is said that there was no contract between the parties binding the appellees to perform these services. But that was necessary. By the terms and legal effect of the deed, this part of the consideration was a condition subsequent, and it was only necessary that the appellees should perform the condition, in order to give effect to the conveyance to their use.

Secondly. It is objected that the instrument is testamentary in its nature, and therefore that no title can be asserted under it until it be admitted to probate. It would be sufficient to obviate the force of this objection, that it was not set up in the bill; but, on the contrary, the instrument is treated as a deed, and is prayed to be set aside because of the incapacity of the grantor to make it,

and of the fraud and undue influence of the appellees in obtaining its execution. But the objection is otherwise untenable.

The instrument was in effect a conveyance, which took effect upon its execution and delivery to the appellees, vesting an interest in them, to take effect in possession at the death of the grantor. It was plainly a covenant to stand seised to the use of the parties for whose benefit the property was intended to be conveyed, whose estate vested in possession, at the determination of his estate for life reserved in it. *Wall* v. *Wall*, 30 Miss. 99. Such an instrument takes effect upon its execution and delivery, as to the interest of the beneficiaries, and concludes the grantor of the right of further disposition. And, of course, it has none of the characteristics of a will.

But the principal ground of controversy is the mental capacity of John Williams to make a valid disposition of his property. Upon this point the testimony is exceedingly voluminous, and extends into many minute details of his conduct, habits, and peculiarities for several years before his death, both in this State and in South Carolina.

It appears that Williams came to this State in the year 1846, and remained here until the spring of the year 1850, when he returned to South Carolina, and took up his residence with the family of the appellees. The greater part of the testimony to show his mental incapacity, is that of witnesses who testify in relation to his conduct and condition whilst he was in this State. These witnesses generally prove that his conduct was strange and extraordinary, and irreconcilable with the condition of sanity. He frequently declared his incapacity to attend to his business, and had it generally transacted by another; his conversation and remarks were incoherent and flighty, with forgetfulness of names of persons and things of recent occurrence; he was very excitable in his temper, exhibiting sudden transitions from anger to good humor, and from laughter to anger; fickle and whimsical in his expressions about the disposition of his property; frequently laughing in a silly manner without any cause. Some of these indications of imbecility are also shown to have been exhibited after his return to South Carolina. Upon the whole, the testimony of the witnesses in this

State tends strongly to show, and the witnesses are nearly all of opinion, that he was not a man of sound mind.

On the contrary, the witnesses in South Carolina, who saw him and had opportunities of judging of his mental condition, from the time of his return up to the date of the deed, state that he was in his right mind, and capable of making a rational disposition of his property. It is true that he occasionally exhibited strange conduct; but it clearly appears by the testimony of witnesses who saw him frequently, and had conversations with him, that he was entirely capable of making a valid disposition of his property. These witnesses are, for the most part, persons of high intelligence, and had ample opportunities of judging as to the state of his mind; the lawyer who drafted the deed, the subscribing witnesses to it, his attending physician during his sickness after his return to South Carolina, and several gentlemen who saw him frequently and conversed with him about the time of the execution of the deed. It appears by their testimony that he had been laboring for a great number of years under partial paralysis, which rendered his motions awkward and his utterance difficult, in addition to which he had been addicted to intemperance in drinking, though not to the extent to impair his mind. These causes produced petulance, absence of mind, and general ill feeling, which caused many strange and peculiar actions, which were frequently exhibited, as testified to by the witnesses in this State; but, in the opinion of the numerous witnesses who knew him after his return to South Carolina, and had known him for many years previous, and had frequent intercourse with him after his return, notwithstanding these strange demonstrations, he was entirely competent to make a rational disposition of his property. And the disposition of the property made by this deed was such as he had for many years declared that it was his intention to make, in consideration of the great kindness which he had received from the appellees' family. This appears to have been done in pursuance of a settled purpose frequently expressed, which is evidence that it was done by the exercise of reason and memory, and tends to show that he had mental capacity to do the act.

Although the actions and peculiarities proved by the witnesses before his return to South Carolina are very strange, yet the condi-

tion of his mind must be determined by the testimony in regard to it at and about the time when the deed was executed. And we think it clear from that testimony, that he must be considered at that time as entirely capable of making a valid disposition of his property.

We, therefore, think that the decree is correct, and should be affirmed, and it is ordered accordingly.